We are focused on a number of internal improvement initiatives to increase sales and profitability, and to manage asset utilization as we continue our progress with becoming an excellent operating company. Our emphasis on supply management is helping to cushion to some extent the rising commodity prices, such as the price of steel. We are aggressively managing this situation and expect that we will be able to offset cost increases by increasing pricing commensurately, although the timing of cost increases versus price increases may not correlate perfectly. Implementation of the Terex Management System ("TMS"), our enterprise resource-planning system, continues to progress, with three businesses located in the U.S., the United Kingdom and Germany having instituted TMS, representing three of our important manufacturing sites. TMS will provide greater visibility into costs, spending and asset utilization, providing valuable information for management to continue to improve the business.

56.    On September 4, 2008, Terex announced via press release both an update to its FY 2008 guidance which lowered its earnings per share guidance and disclosed negative factors impacting the Company's financials and business. The press release stated, in relevant part, as follows:

Terex Corporation (NYSE: TEX) today announced that it is updating 2008 full year guidance and providing quarterly guidance due to changing market conditions. Full year 2008 earnings per share are expected to be between $6.35 and $6.65 compared to $5.85 for the full year 2007, a 9% to 14% increase. Net sales for 2008 are expected to be in the range of $10.2 to $10.6 billion. This guidance compares to the previously announced range for 2008 earnings per share of $6.85 to $7.15 and net sales of $10.5 to $10.9 billion.

Earnings per share are expected to be between $1.26 and $1.38 for the third quarter of 2008 and between $1.20 and $1.33 in the fourth quarter of 2008. This outlook reflects an effective tax rate of approximately 33% and the continued benefit of reduced share count from the Company's share repurchase program. All per share amounts are on a fully diluted basis.

57.    Concerning the lowered guidance figures, DeFeo stated, in relevant part:

While our Cranes and Materials Processing & Mining segments continue to perform better than our expectations, continued market softening and input costs in the Aerial Work Platforms and Construction segments in Western Europe and the United States are expected to more than offset those positive factors.

58.     On the negative disclosures concerning the Company's lowered FY 2008 guidance and weakness in certain Company segments including Aerial Work Platforms and Construction, Terex's stock price fell $9.30 a share or 20%, to close at $38.02 on September 4, 2008.

59.     On October 22, 2008, Terex announced, via press release, its financial results for the third quarter of 2008 ending September 30, 2008 (the "Q3 2008"). For the Q3 2008, Terex reported net income of $93.8 million or 96 cents a share, a significant decrease over the third quarter of 2007's net income of $151.5 million or $1.45 a share. While the defendants noted the continued global credit crisis, they failed to fully disclose the Company's true exposure to the credit crisis and the impact on Terex's future financials.

60.     Commenting on the Q3 2008 results, DeFeo stated in relevant part:

> While we continue to make progress on our improvement initiatives, the current environment is challenging, marked by a continued global credit crisis and worsening economic conditions, particularly in the U.S. and Western Europe. Input costs continue to present challenges for us, although we expect these to moderate over time. At this time, our price increases have not yet fully offset our total material cost increases. We are taking aggressive actions to better position the Company for the expected reduced net sales levels of the next twelve months, in particular in the AWP, Construction, and Materials Processing businesses. At the same time, we are continuing to invest in developing markets and our improvement initiatives, as well as increasing Cranes and Mining capabilities to meet the growing demand in those areas.
>
> We expect 2009 net sales, including the effect of announced acquisitions, to be similar to 2008 full year net sales, driven by continued strong results in Cranes and Mining, offset by lower net sales in AWP, Materials Processing and Construction. The Cranes and Mining businesses continue to grow, in particular in developing markets, where we expect current positive trends to continue. Beginning in the fourth quarter of 2008, for the next twelve months we expect net sales for AWP to be down 30%-40%, for Materials Processing to be down 15%-20% and for Construction to be down 25%-35% versus the prior twelve month period. In light of these overall expectations, we have taken or initiated several actions to properly size our organization and production levels. Additionally, we

have further heightened our focus on cash generation during this time of uncertain access to credit.

61.    Riordan added, in relevant part:

We are taking a series of actions to aggressively reduce costs and inventories in the businesses listed below. We expect that by early 2009 we will achieve working capital levels closer to 22% of trailing three month annualized net sales, versus the approximately 25% level we experienced at the end of the third quarter.

62.    Concerning Terex's Q4 2008 and FY 2008 outlook, the press release stated, in relevant part:

The Company is revising its estimated fourth quarter 2008 earnings per share guidance to reflect changing market conditions, mainly in North America and Western Europe for the AWP and Construction segments, to between $0.80 and $0.90, resulting in full year 2008 earnings per share guidance between $5.69 and $5.79. Corresponding full year 2008 net sales are expected to be between $10.0 and $10.3 billion. These estimates include a total of $0.12 per share in charges through the third quarter 2008 for the crane repair program and headcount reductions. The full year 2008 guidance does not include additional charges that may be required to implement further cost reduction activities. Management's previous earnings per share guidance for the fourth quarter was between $1.20 and $1.33 and full year 2008 earnings per share guidance was between $6.35 and $6.65.

63.    Regarding Terex's results and reduced financial outlook, Widman stated, in relevant part:

Given that external access to credit remains uncertain, we must focus on our cash management. The adjustments to production levels and curtailment of incoming material in the AWP, Construction and Materials Processing businesses are expected to reduce inventory levels, and we will carefully manage incoming material in Cranes and Mining to match the growth expectations of these businesses. We are delaying certain capital spending projects and are not currently purchasing shares under our previously announced share repurchase program. However, during the third quarter, we repurchased approximately $200 million, or 4.2 million shares, and we remain committed to the share repurchase program when access to the capital markets is clearer.

With the actions we are taking to reduce costs and maintain

26

liquidity, we expect to have sufficient flexibility to execute our key business plans.

64.    Concerning Terex's "Construction" and "Roadbuilding, Utility Products and Other" segments, the press release stated, in relevant part:

> Construction: Net sales for the Construction segment for the third quarter of 2008 increased 4.9% to $474.2 million versus the third quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes of approximately $16 million and acquisition related net sales during the third quarter of 2008 of approximately $49 million, net sales decreased approximately 10% versus the prior year period.

> Commercial construction remains weak in North America and continues to weaken in Western Europe, resulting in lower net sales for compact construction equipment. Developing market demand remains strong, particularly in Africa, the Middle East and Eastern Europe, but is not of significant scope to offset the weakness in developed markets. Large infrastructure and mining projects continue to demand rigid frame dump trucks.

> Construction experienced a negative operating margin of 6.0% for the third quarter of 2008 as compared to a positive operating margin of 3.1% for the comparable period in 2007. The operating loss was due to increased input costs combined with lower net sales volume (excluding the impact of acquisitions). Pricing actions have been taken to offset input cost increases and the recent volatility in steel pricing has begun to moderate, but slowing demand in developed markets has resulted in production cuts and reductions in employment levels. Given the near term performance, the Company will continue to monitor the estimated fair value of the Construction business for purposes of determining whether a goodwill impairment is evidenced.

> *    *    *

> Roadbuilding, Utility Products and Other: Net sales for the RBUO segment for the third quarter of 2008 increased 17.7%, to $175.3 million, versus the third quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes, net sales increased approximately 14%. The Utility Products, Roadbuilding and Government Programs businesses all witnessed net sales growth.

> Demand for Utility Products remains favorable from electrical utility customers. Aging utility infrastructure and the replacement cycle of

existing equipment is supporting demand. Roadbuilding net sales increased during the third quarter of 2008 as compared to the third quarter of 2007 due to strong sales from the Brazilian operation combined with moderate sales growth in the U.S. This sales growth was partially offset by lower concrete mixer truck sales.

Due to the low level of road building and infrastructure funding in the U.S., the Company remains cautious regarding the sales outlook for Roadbuilding, and management continues to execute cost containment strategies within this business. The Company will continue to monitor the estimated fair value of the Roadbuilding business for purposes of determining whether goodwill impairment is evidenced.

RBUO operating margin was 2.4% in the third quarter of 2008 versus an operating loss of 1.7% for the comparable period in 2007. Increased volume for Utility Products and the Brazilian based road building operation contributed to stronger margins for the third quarter of 2008. A bad debt charge of approximately $4 million was incurred in the comparable period in 2007, for the Company's re-rental operation, a business that has since been wound down.

65.    The Q3 2008 press release was followed by Terex's earnings conference call which reiterated the defendants' positive representations concerning the Company's Q3 2008 financial results, business, product demand, operations and future prospects.

66.    On November 3, 2008, Terex filed its quarterly report for the Q3 2008 on a Form 10-Q with the SEC ("Q3 2008 10Q") which reiterated the Company's previously announced Q3 2008 financial results. Regarding Terex's impairment charges, the 3Q 2008 10Q, stated, in relevant part:

As of September 30, 2008, the roadbuilding reporting unit within the Roadbuilding, Utility Products and Other segment and the Construction segment, which is a reporting unit, did not meet the forecasted business performance used in the annual goodwill impairment test as of October 1, 2007. The downturn in the U.S. residential housing market, limited funding for infrastructure projects and decreased demand has negatively impacted the businesses in which these reporting units operate.

The Company updated its forecast to address the impact of changes in business conditions and performed a goodwill impairment test as of September 30, 2008 for the roadbuilding and construction reporting

units. The Company's assessment of the roadbuilding and construction reporting units' goodwill resulted in no impairment being evidenced at September 30, 2008. The Company will continue to monitor the estimated fair value of the roadbuilding and construction businesses for purposes of determining whether impairment is evidenced. The amount of goodwill recorded for the roadbuilding and construction reporting units as of September 30, 2008 was $52.6 and $364.2 (million), respectively.

67.    On February 3, 2009, Terex announced via press release an update to the Company's

earnings guidance. The press release stated, in relevant part:

> Terex Corporation (NYSE:TEX) announced that it expects its earnings for 2008 to be approximately 5% below the low end of its previous full year guidance of between $5.69 and $5.79 per fully diluted share. This revised guidance excludes charges associated with the reduction of our production levels, asset impairments and certain other items. Comparable earnings for the full year 2007 were $5.85 per fully diluted share.
>
> Although not yet finalized, the Company expects to record a non-cash impairment charge of certain of the Company's goodwill, identifiable intangibles and other non current assets principally related to its Construction, Roadbuilding and Utilities businesses. This impairment charge is estimated to be approximately $600 million, only a portion of which will be tax affected. We are currently in compliance with all of the financial covenants under our bank credit facilities and indentures and this impairment charge will not affect our compliance.

68.    Regarding Terex's lowered 2008 guidance, DeFeo stated, in relevant part:

> Our fourth quarter 2008 results were affected by the rapid change in global economic conditions more than we anticipated, as well as continued input cost pressure. We continue to feel the negative effect that credit availability has on customer sentiment and demand for our products, particularly in our Construction, Materials Processing and Aerial Work Platforms businesses, as well as our smaller crane and tower crane product lines.
>
> In response to the present economic environment, we are taking and will continue to take aggressive actions to reduce costs and inventories in all of our businesses. We feel we have responded appropriately with significant actions already in progress, many of which we began late last summer and fall. Our actions include reductions in force, significantly curtailed production schedules in affected businesses, including temporary and permanent factory shutdowns, facility

consolidations, the rescheduling of incoming raw materials and reducing executive compensation costs.

69.    On February 11, 2009, Terex announced via press release its Q4 2008 and FY 2008 results. For FY 2008, Terex announced net income of $71.9 million or 72 cents a share, a dramatic decrease from FY 2007's net income of $613.9 million, or $5.85 a share. The Company attributed the results to goodwill impairment charges that reduced net income by $4.60 a share and other pre-tax charges totaling $25.8 million, which decreased FY 2008 net income by 18 cents a share. The press release, stated, in relevant part:

> Terex Corporation (NYSE: TEX) today announced a net loss for the fourth quarter of 2008 of $421.5 million, or $4.46 per share. The net loss in the fourth quarter includes pre-tax non-cash charges of $459.9 million, or $4.84 per share, for the impairment of goodwill. These charges were in the Company's Construction, Roadbuilding and Utility Products businesses. Additionally, the Company incurred pre-tax charges of $21.8 million, or $0.24 per share, primarily associated with a reduction in production levels in the fourth quarter of 2008. These results compare to net income of $174.0 million, or $1.67 per share, for the fourth quarter of 2007. All per share amounts are on a fully diluted basis.
>
> Net sales for the fourth quarter of 2008 dropped by approximately 20% to $2.08 billion versus $2.59 billion in the fourth quarter of 2007, as declining demand in the Company's Aerial Work Platforms, Construction and Materials Processing businesses continued. The translation effect of foreign currency exchange rate changes negatively impacted fourth quarter 2008 net sales by approximately 8%, while acquisitions added approximately 2% to net sales over the prior year's fourth quarter.
>
> For the full year 2008, the Company reported net income of $71.9 million, or $0.72 per share, compared to net income of $613.9 million, or $5.85 per share, for the full year 2007. The goodwill impairment charges mentioned above reduced net income by $4.60 per share for the full year, and other pre-tax charges totaling $25.8 million, primarily related to adjustment of the Company's production levels, decreased full year 2008 net income by $0.18 per share. Net income for 2007 included a $12.5 million pre-tax charge related to the early extinguishment of the Company's 9-1/4% Senior Subordinated Notes, which negatively impacted earnings per share by $0.08.

Net sales were $9.89 billion in 2008, an increase of 8.2% from $9.14 billion in 2007. The translation effect of foreign currency exchange rate changes accounted for approximately 3% of the increase in net sales and acquisitions contributed approximately 3% of the increase in net sales. The strong full year performance of the Cranes and Mining businesses were offset by the dramatic decline in demand for many of the Company's other products during the second half of 2008, largely due to the impact of the rapidly deteriorating global economy.

70.    Commenting on Terex's disappointing financial results, DeFeo stated:

This past year has been like no other – the first half of the year exhibited robust growth and expansion, while the second half of the year was severely impacted by the global credit crisis and economic deterioration, which drove significant declines in customer demand in our businesses. For the full year, net sales increased significantly in our Cranes and Mining businesses, but were offset by the results in our Aerial Work Platforms, Construction, and Materials Processing businesses, which experienced considerable weakness in the second half of the year. Excluding the goodwill impairment charges, our net income for the year was good given the economic environment. Although we are disappointed with our current working capital levels, we have taken aggressive actions to adjust our production to meet reduced customer demand. We maintained a strong cash position and ended the year with a solid balance sheet and sufficient liquidity to execute our key business plans.

Given the current market conditions, it is difficult to project 2009 performance with a reasonable degree of certainty. However, we are planning for continued softness in demand.  We are experiencing increasing levels of cancellations in our backlog for crane and mining products, as well as delays in acceptance of deliveries, as our customers in these areas are not immune to the effects of the global economic downturn. Based on what we know today, we expect our net sales for 2009 to decline by 30% to 35% from 2008. The translation effect of foreign currency exchange rate changes is expected to contribute approximately 13% of this decline. Given the uncertainty and volatility in today's environment, we are not providing earnings guidance until we have better visibility; however, we will continue to take aggressive actions to reduce operating costs and improve our cash flow.

71.    Concerning Terex's various backlogs, the press release stated, in relevant part:

Backlog: Backlog of orders deliverable during the next twelve months was $2.96 billion at December 31, 2008, a decrease of 29.3% and 18.5% versus December 31, 2007 and September 30, 2008,

31

respectively. The decrease was mainly driven by significant reductions in orders for the Aerial Work Platforms, Materials Processing, and Construction businesses, as well as the translation effect of foreign currency exchange rate changes. During the fourth quarter, the Company also experienced softening demand and cancellations and rescheduling of orders in the Cranes and Mining businesses, as the Company confirmed delivery expectations for production in 2009. The above numbers do not incorporate the approximate $648 million Cranes backlog adjustment at September 30, 2008 discussed below.

Aerial Work Platforms (AWP) segment backlog decreased 87.3% as compared to December 31, 2007, and decreased 67.7% as compared to September 30, 2008, primarily due to a significant decline in demand during the fourth quarter as construction activity has dramatically slowed and many of the segment's end markets have experienced 40% to 50% declines in demand. Many of the segment's customers are aging their rental fleets until there is greater clarity in their future business prospects.

Construction segment backlog decreased 64.8% versus the comparable prior year period and decreased 45.1% as compared to September 30, 2008, primarily due to a significant reduction in construction activity in most end markets for this segment's products. Backlog was also impacted by the translation effect of foreign currency exchange rate changes.

Cranes segment backlog decreased 4.0% when compared to December 31, 2007 levels, and was flat as compared to September 30, 2008 levels. As of September 30, 2008, Cranes had not accepted firm orders for a variety of crane types, primarily rough terrain cranes that were scheduled for delivery after January 1, 2009. Production volume for which firm orders had not yet been accepted, and therefore not included in backlog at September 30, 2008, approximated $648 million. A significant portion of these orders were cancelled during the fourth quarter of 2008 due to customer uncertainty regarding the global economic crisis. Backlog was also negatively impacted by a continued softening in orders for tower cranes.

Materials Processing & Mining (MPM) segment backlog decreased 14.0% versus December 31, 2007, primarily due to the translation effect of foreign currency exchange rate changes, and decreased 31.6% as compared to September 30, 2008, primarily due to recent softness in global commodity demand and continued weak demand for Materials Processing products.

Roadbuilding, Utility Products and Other (RBUO) segment backlog declined 24.7% versus December 31, 2007 and declined 17.4% as

compared to September 30, 2008, mainly due to reduced demand for North American asphalt plants and concrete mixer trucks.

72.    Concerning Terex's "Construction" and "Roadbuilding, Utility Products and Other" segments, the press release noted, in relevant part:

> Construction: Net sales for the Construction segment for the fourth quarter of 2008 decreased $202.2 million, or 37.0%, to $343.9 million versus the fourth quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes and acquisition related net sales during the fourth quarter of 2008, net sales decreased approximately 34% versus the prior year period. Weakness in Western Europe that developed very quickly during the third quarter of 2008 and continued into the fourth quarter was the primary driver of lower net sales. Demand for construction equipment remained soft as residential and non-residential construction experienced increasing weakness globally.
>
> In the fourth quarter of 2008, Construction experienced an operating loss of $66.8 million, excluding impairment charges of $364.4 million, as compared to operating income of $12.5 million for the comparable period in 2007. Lower volume and, to a lesser extent, higher input costs, mainly steel, and costs associated with reductions in production levels, primarily drove the decrease as compared to the fourth quarter of 2007.
>
> *    *    *
>
> Roadbuilding, Utility Products and Other: Net sales for the RBUO segment for the fourth quarter of 2008 increased $2.8 million, or 1.6%, to $182.1 million versus the fourth quarter of 2007. Excluding the translation effect of foreign currency exchange rate changes and acquisitions, net sales increased approximately 4%. Sales of utility products increased modestly during the fourth quarter of 2008 versus the comparable period in 2007, and increased net sales of roadbuilding equipment manufactured in Latin America more than offset weaker concrete mixer truck sales and softer sales of roadbuilding equipment in North America.
>
> Operating income for the fourth quarter of 2008, excluding impairment charges of $95.5 million, was $0.4 million, an improvement compared to the operating loss of $4.7 million for the comparable period in 2007. Operating income in the fourth quarter of 2008 benefitted from cost reductions implemented earlier in the year, and was partially offset by costs associated with a reduction in production levels. During the fourth quarter of 2007, the winding down of the Company's re-rental

33

business negatively impacted operating profit by approximately $2 million.

Effective January 1, 2009, the Roadbuilding businesses will be consolidated within the Construction segment, the Utility Products businesses will be consolidated within the AWP segment and the RBUO segment will cease to be a reportable segment.

73.    Statements issued by the defendants during the Class Period were materially false and misleading because they failed to disclose and misrepresented the following material adverse facts, including that: (a) Terex failed to properly and timely account for certain impaired assets within the Company including in its "Construction" and "Roadbuilding, Utility Products and Other" segments/units; (b) Terex was experiencing declining demand for its products in its Construction, Materials Processing and Aerial Work Platforms segments; (c) Terex's financials were much weaker than represented; (d) Terex was not as prepared and diversified as represented to withstand its significant exposure to a weakening global credit market and economy; and (e) the defendants lacked a reasonable basis for positive statements and representations concerning Terex's FY 2008 earnings guidance and the Company's overall business prospects.

74.    On February 27, 2009, Terex filed its Annual Report on a Form 10-K with the SEC (the "2008 10K"). Concerning the Company's asset impairment charge, the 2008 10K stated, in relevant part:

We use ROIC as a unifying metric because we feel that it measures how effectively we invest our capital and provides a better measure to compare ourselves to peer companies to assist in assessing how we drive operational improvement. We believe that ROIC measures return on the full enterprise-wide amount of capital invested in our business, as opposed to another metric such as return on shareholder's equity that only incorporates book equity, and is thus a more accurate and descriptive measure of our performance. We also believe that adding Debt less Cash and cash equivalents to Total stockholders' equity provides a better comparison across similar businesses regarding total capitalization, and ROIC highlights the level of value creation as a percentage of capital invested. Consistent with this belief, we use ROIC in evaluating executive performance and

34

compensation, as we have disclosed in the Compensation Discussion and Analysis in our proxy statement for the 2008 annual meeting of stockholders. As of October 1, 2008, we performed our annual goodwill impairment test, which resulted in a non-cash impairment charge for goodwill of $459.9 million, which represented all of the goodwill recorded in the Construction and RBUO segments. However, we do not believe that non-cash impairment charges are indicative of returns on our invested capital. Therefore, we have excluded the effect of these impairment charges from the metrics used in our calculation of ROIC. As the tables below show, our ROIC at December 31, 2008 was 19.2%, down from 28.9% at December 31, 2007. The decrease reflects reduced NOPAT performance from approximately $641 million to approximately $601 million and the increased invested capital impact of recent acquisitions of approximately $482 million.

\* \* \*

As of October 1, 2008, we performed our annual goodwill impairment test, which resulted in a non-cash impairment charge for goodwill of $459.9 million and represented all of the goodwill recorded in the Construction and RBUO segments. This goodwill impairment charge was necessary, as the fair value of the reporting units within these segments had significantly declined, reflecting reduced estimated future cash flows for these businesses based on lower expectations for growth and profitability, primarily as a result of the current global economic downturn.

75. As of September 30, 2008, the Company told investors there was <u>no</u> goodwill impairment. However, as of one day later, October 1, 2008, Terex reported a goodwill impairment of nearly $460 million.

76. Either the normal impairment or the likelihood of impending charges materially affecting the Company's financial results were not disclosed to investors for months.

77. On the news of the Company's weak financial results and forecast, Terex stock fell $4.17 a share to close at $9.45 a share on February 12, 2009.

## LOSS CAUSATION/ECONOMIC LOSS

78. During the Class Period, defendants engaged in a course of conduct that artificially inflated the Company's securities and operated as a fraud and deceit on purchasers of Terex's

35

securities. The price of Terex's common stock fell when the misrepresentations made to the investing community, including the disclosure of materially false and misleading financial statements, filings with the SEC and statements issued through Terex's conference calls were finally disclosed to investors. As a result, plaintiff and other members of the Class suffered damages.

79.    The failure to disclose to investors and analysts the adverse facts concerning Terex's financials and operating condition as well as the Company's business prospects caused and maintained the artificial inflation in Terex's stock price throughout the Class Period until the truth was disclosed to the market. Throughout the Class Period, the defendants' false and misleading statements had the intended effect and caused the Company's stock price to trade at artificially inflated levels, trading as high as approximately $76.25 a share in May of 2008.

## FRAUD ON THE MARKET ALLEGATIONS

80.    The market for Terex's securities was open, well-developed and efficient at all relevant times.

81.    Because of the materially false and misleading statements and failures to disclose, set forth above, Terex's securities traded at artificially inflated prices during the Class Period.

82.    Plaintiff and other members of the Class purchased or otherwise acquired Terex's securities relying upon the integrity of the market price of Terex's securities and market information relating to Terex, and have been damaged thereby.

83.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Terex's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading. These statements and omissions were materially false and misleading in that

they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations.

84.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiff and other members of the Class.

85.    As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Terex's financial strength and business prospects. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Terex and its business, capitalization, and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.

86.    Defendants' materially false and misleading statements during the Class Period resulted in plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

### SCIENTER

87.    Defendants acted with *scienter* in that they knew or recklessly disregarded that the public documents and statements, issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance and/or dissemination of such statements or documents in primary violation of the federal securities laws.

88.    As set forth herein, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Terex, their control over and/or receipt and/or modification of Terex's allegedly materially misleading misstatements and/or their associations

with the Company which made them privy to confidential proprietary information concerning Terex, participated in the fraudulent scheme alleged herein.

89.    Because of their executive and managerial positions with Terex, the Individual Defendants had access to the adverse non-public information about the business, finances, markets and present and future business prospects of Terex particularized herein *via* access to internal corporate documents, conversations or connections with corporate officers or employees, attendance at management and Board of Directors' meetings thereof and/or via reports and other information provided to them in connection therewith.

90.    Defendants had a duty to promptly disseminate accurate and truthful information with respect to Terex's business operations, financial condition and business prospects, or to cause and direct that such information be disseminated and to promptly correct any previously disseminated information that was misleading to the market. As a result of their failure to do so, the price of Terex's common stock was artificially inflated during the Class Period, damaging plaintiff and the Class.

91.    Defendants knew and/or recklessly disregarded the falsity and misleading nature of the information that they caused to be disseminated to the investing public. The ongoing fraudulent scheme described in this Complaint could not have been perpetuated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company, including the Individual Defendants.

92.    Each defendant is liable as a primary violator of the securities laws in making false and misleading statements, and for participating in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Terex's securities during the Class Period.

93.    The Individual Defendants, because of their positions with Terex, controlled the contents of the quarterly reports, annual reports and press releases disseminated throughout the

Class Period. Each Individual Defendant was provided with or had access to copies of the reports and press releases alleged herein to be false and/or misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations which were being made were false and misleading. As a result, each of the Individual Defendants is responsible for the accuracy of Terex's corporate releases detailed herein and is, therefore, responsible and liable for the representations contained therein.

94.     In addition, during the Class Period, certain of the Company insiders sold shares of their personally held common stock for proceeds of approximately $9 million.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class") consisting of all persons and entities who purchased or otherwise acquired the securities of Terex during the Class Period. Excluded are defendants, any entity in which defendants have a controlling interest or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, employees, affiliates, legal representatives, heirs, predecessors, successors and assigns of defendants.

96.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are thousands of members of the Class.

97.     Questions of law and fact are common to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether the Company issued materially false and misleading financial statements via press release, filing with the SEC and conference calls concerning Terex's financial strength and business prospects, during the Class Period;

(c)     whether defendants acted knowingly or recklessly in issuing materially false and misleading statements;

(d)     whether the market prices of the Company's securities during the Class Period were artificially inflated because of defendants' conduct complained of herein;  and

(e)     whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

98.     Plaintiff's claims are typical of the claims of the members of the Class as plaintiff and the other members of the Class each sustained damages arising out of the defendants' wrongful conduct in violation of federal law as complained of herein.

99.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class actions and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

100.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy because joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members

individually to redress the wrongs done to them. Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

101. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud on the market doctrine in that:

(a) defendants made public misrepresentations or failed to disclose material facts concerning Terex's financial strength and business prospects, during the Class Period;

(b) such omissions and misrepresentations were material;

(c) the Company's securities traded in an efficient market and their prices were inflated artificially during the Class Period because of defendants' misrepresentations and omissions detailed herein;

(d) the misrepresentations and omissions alleged induced a reasonable investor to misjudge the value of the Company's securities; and

(e) plaintiff and the other members of the Class purchased Terex's securities between the time defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

102. Based upon the factors set forth in the preceding paragraph, plaintiff and the other members of the Class are entitled to the presumption of reliance upon the integrity of the market.

## NO STATUTORY SAFE HARBOR

103. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint because none of the statements pleaded herein are "forward-looking" statements nor were they identified as "forward-looking statements" when made. No meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in any purportedly forward looking-statements.

41

104.    In the alternative, to the extent that the statutory safe harbor does apply to any statements pleaded herein that are deemed to be forward-looking, defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker knew those forward-looking statements were false and/or the statement was authorized and/or approved by an executive officer of Terex who knew that the statements were false when made.

## COUNT I

### (VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 BROUGHT AGAINST ALL DEFENDANTS)

105.    Plaintiff repeats and realleges the allegations contained above as if fully set forth herein.

106.    During the Class Period, defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit upon plaintiff and the other members of the Class, and made various deceptive and untrue statements of material facts and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to plaintiff and the other members of the Class. The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to deceive the investing public, including plaintiff and the other members of the Class, and to induce plaintiff and the other members of the Class to purchase Terex's securities during the Class Period at artificially inflated prices.

107.    During the Class Period, defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and/or recklessly issued, caused to be issued deceptive and materially false and misleading statements to the investing public as particularized above.

42

108.    Because of defendants' dissemination of and/or failure to correct the false and misleading statements set forth above, the market price of Terex's securities was artificially inflated during the Class Period.  Unaware of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by defendants, plaintiff and the other members of the Class who purchased Terex's securities on the open market, relied, to their detriment, on the integrity of the market price of the securities in purchasing Terex's securities.

109.    Had plaintiff and the other members of the Class known the truth, they would not have purchased Terex's securities or would not have purchased them at the inflated prices paid.

110.    Plaintiff and the other members of the Class have suffered damages as a result of the wrongs herein alleged in an amount to be proven at trial.

111.    By reason the foregoing, defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to plaintiff and the other members of the Class for damages that they suffered in connection with their purchases of Terex securities during the Class Period.

## COUNT II

### VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT
### BROUGHT AGAINST DEFEDANTS DEFEO, WIDMAN AND RIORDAN, THE INDIVIDUAL DEFENDANTS

112.    Plaintiff repeats and realleges the allegations contained in ¶ 1 through 104 and ¶ 106 through 111 above as if fully set forth herein.

113.    The Individual Defendants are liable as direct participants in the wrongs complained of herein.

114.    Because they signed the SEC filings and/or because of the positions they held in Terex management, the Individual Defendants directly participated in the day-to-day operations of

43

the Company and were privy to confidential proprietary information concerning the Company, financial condition, and business operations.

115.    The Individual Defendants are responsible for Terex's public filings and press releases, and are provided with copies of Terex's public filings and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

116.    The Individual Defendants are responsible for the accuracy of the public filings and press releases detailed herein, and are therefore primarily liable for the representations contained therein.

117.    By reason of their management positions and ability to make public statements on behalf of Terex, the Individual Defendants were and are controlling persons, and had the power and influence to cause and did cause Terex to engage in the unlawful conduct complained of herein.

118.    The Individual Defendants acted as controlling persons of the Company within the meaning of section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level as officers and/or directors of the Company, and active participation in and/or awareness of the Company's day-to-day operations, and/or intimate knowledge of the Company's business plans and implementation thereof, each Individual Defendant had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff alleges are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged herein to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

44

119.    The Individual Defendants had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

120.    By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

121.    As a direct and proximate result of the wrongful conduct of the Individual Defendants, plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on its own behalf and on behalf of the Class, prays for judgment as follows:

(a)    Declaring this action to be a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding plaintiff and the other members of the Class damages in an amount that may be proven at trial, together with interest thereon;

(c)    Awarding plaintiff and the members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' and experts' witness fees and other costs; and

(d)    Such other relief as this Court deems appropriate.

45

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 15, 2010

SCOTT + SCOTT, LLP

By: _____

David R. Scott (Federal Bar No. CT 16080)
Erin Green Comite (Federal Bar No.CT 24886)
108 Norwich Avenue
Colchester, CT 06415
Tel.:  860-537-5537
Fax:  860-537-4432

-and-

SCOTT + SCOTT, LLP
Joseph Guglielmo (Federal Bar No.CT 27481)
500 Fifth Avenue, 40th Floor
New York, NY 10110
Tel.:  (212) 223-6444
Fax:  (212) 229-6092

ZWERLING, SCHACHTER
& ZWERLING, LLP
Robert S. Schachter
Richard A. Speirs
Shaye J. Fuchs
41 Madison Avenue
New York, NY  10010
Tel.:  (212) 223-3900
Fax:  (212) 371-5969

*Attorneys for Plaintiff*

## CERTIFICATION

I, Michael Glassman, on behalf of the Kathleen and Michael Glassman Family Trust (the "Trust"), declare that the following is true and correct to the best of my knowledge, information and belief:

1.    I have reviewed the complaint regarding Terex Corporation ("Terex") and have authorized Zwerling, Schachter & Zwerling LLP ("ZSZ") to file it on my behalf as Trustee of the Trust.  I have retained ZSZ to represent me in connection therewith and in related litigation in connection with the securities that are set forth in this certification.

2.    The Trust did not sell, purchase or acquire the securities that is the subject of this action at the direction of counsel or in order to participate in any private action under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    The Trust's transactions in the securities that are the subject of this action during the class period are as follows:  (a) sold October 2008 $50 put contracts for Terex common stock ~ ON MARCH 20, 2008 MWG at $5.40 per contract for total consideration $2,700; and (b) purchased 500 shares of Terex common stock on October 8, 2008 at $50 per share for a total consideration of $25,000.

5.    During the three years preceding the date of this certification, neither I nor the Trust have sought to serve or served as a representative party on behalf of a class.

6.    Neither I nor the Trust will accept any payment for serving as a representative party on behalf of a class, except to receive the Trust's *pro rata* share of any recovery or as ordered or approved by the Court, including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I, Michael Glassman, on behalf of the Trust, certify that the foregoing is true and correct.

Dated: January 14, 2010

Michael Glassman